64 F.3d 892
 Nuclear Reg. Rep. P 20,570, 41 ERC 1849,
26 Envtl. L. Rep. 20,246
 STATE of SOUTH CAROLINA, ex rel.; Carroll A. CAMPBELL, Jr.,
Governor of South Carolina; T. Travis Medlock, Attorney
General of South Carolina; Barbara G. Campbell; Janine
Graham; Edlis Hunt; Geneva Lucas; Alice Seals; the
Center for Community Action; Blue Ridge Environmental
Defense League, Incorporated; the Conservation Council of
North Carolina, Incorporated, Plaintiffs-Appellees,
v.
Hazel O'LEARY, Secretary of Energy; United States
Department of Energy, Defendants-Appellants,
and
Hahn-Meitner Institut Berlin; Paul Scherrer Institute of
Switzerland; Austrian Research Centre Siebersdorf; Risoe
National Laboratory of Denmark; SKB Swedish Nuclear Fuel &
Waste Management Company; Delft University of Technology in
the Netherlands, Defendants.
STATE of SOUTH CAROLINA, ex rel.: Carroll A. CAMPBELL, Jr.,
Governor of South Carolina; T. Travis Medlock, Attorney
General of South Carolina; Barbara G. Campbell; Janine
Graham; Edlis Hunt; Geneva Lucas; Alice Seals; the
Center for Community Action; Blue Ridge Environmental
Defense League, Incorporated; the Conservation Council of
North Carolina, Incorporated, Plaintiffs-Appellees,
v.
HAHN-MEITNER INSTITUT BERLIN; Paul Scherrer Institute of
Switzerland, Defendants-Appellants,
and
Hazel O'Leary, Secretary of Energy; United States
Department of Energy; Austrian Research Centre Siebersdorf;
Risoe National Laboratory of Denmark; SKB Swedish Nuclear
Fuel & Waste Management Company; Delft University of
Technology in the Netherlands, Defendants.
 Nos. 95-1182, 95-1183.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 8, 1995.
Decided Aug. 22, 1995.
 
 ARGUED: Lois J. Schiffer, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC; Joseph Richard Egan, Egan & Associates, P.C., Washington, DC, for appellants. Kenneth Paul Woodington, Assistant Attorney General, Columbia, SC; John David Runkle, Chapel Hill, NC, for appellees. ON BRIEF: Peter R. Steenland, Jr., Charles W. Findlay, Edward J. Shawaker, Environment & Natural Resources Division, United States Department of Justice, Washington, DC; Mark Johnston, Deputy General Counsel, United States Department of Energy, Washington, DC; John W. Lawrence, Egan & Associates, P.C., Washington, DC; James C. Gray, Jr., Howard A. VanDine, III, Nelson, Mullins, Riley & Scarborough, L.L.P., Columbia, SC, for appellants. Charles Molony Condon, Attorney General, Cameron B. Littlejohn, Jr., Assistant Attorney General, Columbia, SC; Henry L. Deneen, Chief Legal Counsel to the Governor, Elizabeth B. Partlow, Legal Counsel to the Governor, Columbia, SC; Melany Earnhardt, North State Legal Services, Hillsborough, NC; Dale G. Deese, Lumbee River Legal Services, Pembroke, NC, for appellees.
 Before RUSSELL, HALL and NIEMEYER, Circuit Judges.
 Reversed and vacated by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge HALL concurred. Judge DONALD RUSSELL wrote a separate dissenting opinion.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 On January 27, 1995, the district court in South Carolina enjoined the United States from honoring its commitment, made in furtherance of its nuclear nonproliferation policy, to receive into this country and store 409 spent nuclear fuel rods from European research reactors. The United States Department of Energy planned to store the rods in existing and available storage spaces located at its Savannah River Site near Aiken, South Carolina. The district court held that even though the Department of Energy had conducted an Environmental Assessment of its action, in which it found that the action would cause no significant environmental impact, the agency still was required to prepare a full Environmental Impact Statement. The Department of Energy appealed, arguing that its Environmental Assessment was adequate and that if the district court's injunction were not vacated on an expedited basis, the United States' nonproliferation policy would be at risk.
 
 
 2
 Because the admission of these 409 spent fuel rods has become a matter of urgency for United States foreign policy, we stayed the district court's injunction pending the issuance of this opinion. After reviewing the Department of Energy's Environmental Assessment in light of applicable law, we now conclude that the agency fulfilled its responsibilities under the National Environmental Policy Act ("NEPA"), 42 U.S.C. Sec. 4321 et seq., and related statutes. Accordingly, we reverse the district court's judgment and vacate the injunction.
 
 
 3
 * As an important aspect of the United States' longstanding policy for the nonproliferation of nuclear weapons, the United States has sought to convert foreign nuclear reactors from using highly-enriched uranium, which may readily be employed in the construction of nuclear weapons, to low-enriched uranium, which cannot be so employed. Adopting a formal program to encourage that conversion, known as the Reduced Enrichment for Research and Test Reactors program (the "Reduced Enrichment program"), the United States has committed to accept highly-enriched spent nuclear fuel rods from European research reactors for storage in facilities in the United States. Since the 1950s, the United States has supplied nuclear fuel to these foreign research reactors, and until 1992, it agreed to "reprocess" the spent fuel rods. The reprocessing involved a procedure by which the highly-enriched uranium was chemically separated from the spent nuclear fuel and was recycled back into research reactors as fresh fuel or, alternatively, into the United States' nuclear weapons program. With the end of the Cold War, however, the United States stopped reprocessing spent fuel rods. It also modified the policy of its Reduced Enrichment program, committing to do nothing more than permanently store spent fuel rods in domestic facilities.
 
 
 4
 Because recently enacted statutes and regulations require that the modified Reduced Enrichment program receive environmental review before the Department of Energy can officially implement the policy, foreign nuclear reactors have been forced to retain spent fuel rods at their sites. Over time, storage space for spent fuel rods at foreign reactor sites began to run out, creating the risk that that the foreign reactors would transfer their spent fuel rods to other countries for reprocessing, thus perpetuating the use of highly-enriched uranium in nuclear fuel in contravention of the United States' nonproliferation policy. A market in highly-enriched uranium would promote the fabrication of nuclear weapons.
 
 
 5
 In July 1993, Hazel O'Leary, the Secretary of Energy, announced a three-tiered proposal to establish a policy for dealing with the problem created by the Department of Energy's cessation of the receipt of foreign reactor spent fuel. Under the proposal, the Department of Energy recommended: (1) the preparation of an Environmental Impact Statement in connection with a long term plan of selecting a site and constructing a facility to receive 24,000 spent fuel rods from European research reactors; (2) the preparation of an Environmental Assessment in connection with the immediate receipt of a few hundred spent fuel rods in urgent need of shipment for storage at the Department of Energy's existing storage facility at the Savannah River Site; and (3) the declaration of an emergency situation, pursuant to 40 C.F.R. Sec. 1506.11, for reactor facilities whose situation was so urgent that they could not await completion of an Environmental Assessment.
 
 
 6
 The United States does not have the capacity to receive and store 24,000 spent nuclear fuel rods. If it were to adhere to its policy to receive this large number of rods, a site would have to be selected and a facility constructed following the preparation of a full Environmental Impact Statement. The Department of Energy's Savannah River Site, which is the only site currently available for storing spent nuclear fuel rods, had approximately 1,400 storage spaces remaining when the Department of Energy announced its plan. Accordingly, the site could be used only for the few hundred rods in urgent need of shipment.
 
 
 7
 In connection with the proposal to receive immediately those spent fuel rods in urgent need of shipment, representatives of the Department of Energy and the State Department conducted an inspection tour of European reactors. Following their tour and the preparation of a draft Environmental Assessment, the Department of Energy released a final Environmental Assessment in April 1994, determining that 409 spent fuel rods were in urgent need of shipment and that there would be no significant environmental impact if these rods were shipped to the Savannah River Site. The Department thus committed to receiving 409 spent fuel rods from eight research reactors located in Austria, Denmark, the Netherlands, Sweden, Germany, Switzerland, and Greece.
 
 
 8
 In the fall of 1994, pursuant to that Environmental Assessment, the Department of Energy received the first shipment of 153 of the 409 spent fuel rods and stored them at the Savannah River Site. Because 99 rods originally scheduled for delivery as part of the 409 were later found not to meet the requirements for urgency set out in the Environmental Assessment, only 157 of the 409 spent fuel rods in need of urgent shipment remain to be delivered. Approximately 1,150 spaces remain open at the Savannah River Site.
 
 
 9
 In September 1994, South Carolina filed this action, seeking an injunction to prohibit receipt of the 409 fuel rods. It contended that the Environmental Assessment prepared by the Department of Energy was inadequate and that a full Environmental Impact Statement was required. The district court granted a preliminary injunction barring entry into the United States of the first shipment of 153 spent fuel rods. At the time the injunction was entered, these rods were already on board vessels in the Atlantic Ocean en route to the United States. On September 23, 1994, this court stayed the injunction, holding that South Carolina had failed to show harm sufficient to outweigh the United States' foreign policy interest in receiving the 153 spent rods. Those rods are now in storage at the Savannah River Site.
 
 
 10
 On January 27, 1995, the district court issued findings of fact and conclusions of law and entered a permanent injunction prohibiting the Department of Energy from "allowing further shipments of spent nuclear fuel to enter this country until an Environmental Impact Statement has been prepared for those shipments." The district court concluded that the United States' commitment to receive, on an urgent basis, 409 spent fuel rods had been improperly segmented from the larger shipment of 24,000 rods for which the Department of Energy recognized the need to prepare an Environmental Impact Statement. The court concluded that, when viewed together with the larger proposed shipment of 24,000, the urgent relief shipments of 409 rods constituted "connected actions," "cumulative actions," and "similar actions" under 40 C.F.R. Sec. 1508.25(a), thus requiring the Department of Energy to consider the urgent relief shipments as part of the larger shipment for which an Environment Impact Statement is required. Additionally, the district court read the "Spence Amendment" to the National Defense Authorization Act for Fiscal Year 1994 to prohibit the urgent relief shipments unless the Department of Energy either declared an emergency for the urgent relief shipments or prepared an Environmental Impact Statement. The court therefore concluded that there was "no legal provision" for approving the 409-rod shipments with only an Environmental Assessment. Finally, the district court found that, in any event, the Environmental Assessment conducted by the Department of Energy was inadequate because it failed to discuss adequately the alternatives to storing the 409 rods at the Savannah River Site.
 
 
 11
 This appeal followed.
 
 II
 
 12
 The National Environmental Protection Act (NEPA) requires that each federal agency prepare an Environment Impact Statement on "every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. Sec. 4332(2)(C); Kleppe v. Sierra Club, 427 U.S. 390, 394, 96 S.Ct. 2718, 2723, 49 L.Ed.2d 576 (1976). And the Council on Environmental Quality regulations implementing NEPA, see 40 C.F.R. Secs. 1500-1508, require each federal agency to prepare an Environmental Assessment, i.e. a document containing sufficient evidence and analysis to "determin[e] whether to prepare an Environmental Impact Statement or a finding of no significant impact." 40 C.F.R. Sec. 1508.9(a). Thus, if the Environmental Assessment results in a finding of no significant impact, the agency is not required to prepare an Environmental Impact Statement. An agency's decision to rely on an Environmental Assessment instead of preparing an Environmental Impact Statement is entitled to deference from the courts. See Providence Road Community Ass'n v. EPA, 683 F.2d 80, 82 (4th Cir.1982).
 
 
 13
 In connection with the Department of Energy's proposed receipt and storage of 409 spent nuclear fuel rods at the existing facilities at the Savannah River Site, the agency prepared an Environmental Assessment. Following the issuance of two drafts of the Environmental Assessment and the analysis of public comments, the Department of Energy issued a final Environmental Assessment on April 22, 1994. The Assessment concluded that 409 spent fuel rods qualified for urgent relief shipment from reactors in Austria, Denmark, the Netherlands, Sweden, Germany, Switzerland and Greece. The Assessment also specified that the shipments would enter the United States through the military port of Sunny Point, North Carolina, and travel from there to the Savannah River Site by both truck and rail. Following an extensive analysis of the evidence, the Environmental Assessment concluded that the receipt of 409 rods for storage at the Savannah River Site would not significantly impact the environment. Accordingly, it was determined that no Environmental Impact Statement was necessary for the shipment and storage of the 409 rods.
 
 
 14
 The district court concluded that the Environmental Assessment was inadequate in three respects. First, it held that the Spence Amendment, enacted in 1993, eliminated the option of preparing an Environmental Assessment for rods shipped for storage at the Savannah River Site. Second, it held that the Environmental Assessment improperly segmented the 409 spent fuel rods from the larger proposed shipment of 24,000 spent fuel rods, for which an Environmental Impact Statement is required. Finally, it concluded that the Department of Energy's Environmental Assessment was inadequate on its face because "at least two alternatives were either ignored completely or insufficiently discussed." We address these points in order.
 
 
 15
 * In the fall of 1993, Congress passed the "Spence Amendment," named after its sponsor, Congressman Floyd D. Spence of South Carolina, which is encompassed in Sec. 3151 of the National Defense Authorization Act for Fiscal Year 1994.[1] The Spence Amendment regulates the "receipt and storage of spent nuclear fuel ... at the Savannah River Site." Pub.L. No. 103-160, Sec. 3151, 107 Stat. at 1949. The district court interpreted that statute to require the Department of Energy to prepare an Environmental Impact Statement for the receipt and storage of any spent nuclear fuel at the Savannah River Site in the absence of a formal declaration of emergency. Thus, if the district court's reading were correct, the Department of Energy would not be entitled to rely on an Environmental Assessment to ship spent nuclear fuel rods to the Savannah River Site. However, for the reasons we discuss, we conclude that the district court's interpretation of the statute is incorrect.
 
 
 16
 On its face, the Spence Amendment requires the completion of an Environmental Impact Statement only if the Secretary of Energy intends to "receive and store at the Savannah River Site any spent nuclear fuel in excess of the amount that (as of the date of the enactment of this Act) the Savannah River Site is capable of receiving and storing." Id. (emphasis added). The statute clearly permits the Secretary of Energy to accept and store spent nuclear fuel at the Savannah River Site in the absence of an emergency and without preparing an Environmental Impact Statement, as long as the number of fuel rods does not exceed the number of available storage spaces at the site.
 
 
 17
 When the Department of Energy decided to accept 409 spent fuel rods for storage at the Savannah River Site, the site contained approximately 1,400 available storage spaces. Currently, approximately 1,150 storage spaces remain available, taking into account the 153 rods already shipped and stored there. Since only 157 of the 409 spent fuel rods covered by the Environment Assessment remain to be delivered, the 1,150 available storage spaces at the Savannah River Site are more than adequate to accommodate these remaining rods.
 
 
 18
 While the Spence Amendment clearly implicates the Department of Energy's plans to receive 24,000 spent nuclear rods, since that number far exceeds the capacity at the Savannah River Site, the Amendment does not apply to the Department of Energy's decision to import the 409 rods in urgent need of shipment, including the 157 rods which remain to be shipped.
 
 B
 
 19
 In justifying its injunction against the United States, the district court also ruled that the shipment of 409 spent rods would constitute an improper segmentation from the Department of Energy's larger plan to import 24,000 spent fuel rods. It concluded that since an Environmental Impact Statement is required for the 24,000 rods, it was an improper circumvention of that requirement to import the 409 rods with only an Environmental Assessment.
 
 
 20
 The NEPA regulations prohibit an agency from avoiding the requirement of preparing an Environmental Impact Statement by "breaking [its proposed action] down into small component parts" in order to enable it to make a finding of no significant impact on each component. 40 C.F.R. Sec. 1508.27(b)(7). See also Kleppe, 427 U.S. at 409-10, 96 S.Ct. at 2730 (when an agency addresses several proposals related to actions that will have a "cumulative or synergistic environmental impact upon a region ..., their environmental consequences must be considered together").
 
 
 21
 South Carolina does not argue, nor can it, that the Department of Energy is dividing the importation of European spent fuel rods into several minor shipments in order to avoid the preparation of any Environmental Impact Statement, for the Department of Energy is already conducting an Environmental Impact Statement for the importation of the 24,000 spent fuel rods. Instead, South Carolina argues that there is no meaningful distinction between the urgent relief shipments of 409 rods and the total proposed shipment of 24,000 rods and that if an Environmental Impact Statement is required for the total shipment, the Department of Energy should likewise be required to prepare an Environmental Impact Statement for the "segmented" urgent relief shipments.
 
 
 22
 However, South Carolina apparently fails to appreciate the significance of the fact that there is no site or facility in the United States to receive the 24,000 rods and that an Environmental Impact Statement must be prepared for such a major endeavor. With respect to the 409 rods in need of urgent relief, however, the plan is to store them at existing and approved facilities at the Department of Energy's Savannah River Site. That site is currently being used on a continuing basis to receive spent nuclear fuel rods from U.S. research reactors, and no Environmental Assessment or Environmental Impact Statement is demanded for each domestic shipment of those rods to the Savannah River Site. The fact that the 409 rods under consideration originate in Europe, instead of the United States, has not been shown to impose a meaningfully different environmental impact. Indeed, the Environmental Assessment conducted by the Department of Energy found that the shipment and storage of these 409 rods would result in no significant impact.
 
 
 23
 Furthermore, as we held in State of North Carolina v. City of Virginia Beach, 951 F.2d 596 (4th Cir.1991), the segmentation of one phase of a larger project prior to the completion of the environmental review of the entire project constitutes impermissible segmentation only if the component action has a "direct and substantial probability of influencing [the agency's] decision" on the larger project. Id. at 603. These urgent relief shipments fail to pose such an influence; they do not in any way commit the government to accepting the larger shipment of 24,000 rods nor do they determine the outcome of the Environmental Impact Statement that is currently being prepared for the larger shipment.
 
 
 24
 Finally, the district court held that the urgent relief shipments of 409 rods and the larger, proposed 24,000-rod shipments qualify as "connected actions," "cumulative actions," and "similar actions" within the meaning of 40 C.F.R. Sec. 1508.25(a). If the district court were correct, then the applicable NEPA regulations would require that such related actions be considered in the same Environmental Impact Statement. However, a careful reading of the regulations fails to support the district court's conclusion.
 
 
 25
 Separate actions are considered "connected" if they (1) "[a]utomatically trigger other actions which may require Environmental Impact Statements"; (2) "[c]annot or will not proceed unless other actions are taken previously or simultaneously"; or (3) "[a]re interdependent parts of a larger action and depend on the larger action for their justification." See 40 C.F.R. Sec. 1508.25(a)(1). The urgent relief shipments of 409 rods do not qualify as "connected actions" under any of these three definitions. The shipments involving 409 rods do not "automatically trigger" the acceptance of the larger 24,000-rod shipments, nor does their utility depend upon the viability of the larger shipment. The urgent relief shipments are independent and separable, and merely preserve the Department of Energy's option to accept the larger shipments.
 
 
 26
 The urgent relief shipments of 409 rods and the larger proposed shipments of 24,000 rods also do not qualify as "cumulative actions," which are defined as actions "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. Sec. 1508.25(a)(2). By itself, the proposed shipment of 24,000 spent fuel rods has a significant impact requiring an Environmental Impact Statement. Such a shipment will necessitate the construction of a new domestic storage facility regardless of whether the Department of Energy is permitted to accept the urgent relief shipments. Furthermore, the cumulative impact of accepting the urgent relief shipments is not "significant," in that it does not require the construction of a new facility or even materially deprive the United States of existing storage facilities. The Department of Energy has projected that it will run out of storage spaces at the Savannah River Site in May 1999 if it does not receive the urgent relief shipments, and in January 1999 if it does receive them.
 
 
 27
 We also disagree with the district court's characterization of the two separate projects as "similar actions." Similar actions are defined as having "similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. Sec. 1508.25(a)(3). Other than the fact that both the urgent relief shipments and the larger 24,000-rod shipments involve spent nuclear fuel, the two shipments are dissimilar. The timing of the shipments is different, since the urgent relief shipments are scheduled to conclude within the next few months and the larger shipments will not begin for several years, if ever. Moreover, since a site for the larger facility has not been selected, it may be constructed at an entirely different area of the country with no geographic similarity to the Savannah River Site.
 
 
 28
 Accordingly, we conclude that the district court's segmentation argument is not supported in fact or by law.
 
 C
 
 29
 As its final reason for entering the injunction and rejecting the Environmental Assessment prepared by the Department of Energy, the district court concluded that the Department of Energy failed to consider alternatives to the Savannah River Site for storage of the urgent relief shipments. Under NEPA and corresponding regulations, an Environmental Assessment, must include "brief discussions" of alternatives to the proposed agency action. See 40 C.F.R. Sec. 1508.9.
 
 
 30
 The district court found specifically in this case that the Department of Energy "ignored completely or insufficiently discussed" both (1) reprocessing the spent fuel in the United States, and (2) reprocessing it, storing it, or "blending it down" at Britain's Atomic Energy Agency facility in Dounreay, Scotland. Both alternatives, however, involve the reprocessing of highly-enriched uranium, which is inconsistent with the current United States policy. The reprocessing of spent highly-enriched nuclear fuel rods produces materials that may be used for fabricating nuclear weapons. Yet current national policy specifically seeks to avoid this possibility. As the Environmental Assessment prepared by the Department of Energy noted, "Reprocessing increases the threat of nuclear proliferation because it encourages the continued use of highly-enriched uranium." Thus, the Department of Energy did effectively consider the reprocessing alternatives identified by the district court and rejected them as contrary to national policy. And the courts are not free to reject an Environmental Assessment because an agency refuses to change its policy. See Coalition For Responsible Regional Development v. Coleman, 555 F.2d 398, 401-02 (4th Cir.1977) (alternative properly rejected because it would "not accomplish the objectives of the (proposed) project"); Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1180 (9th Cir.1990) (an agency is not required to consider alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives" for the action at issue).
 
 III
 
 31
 The governor and attorney general of South Carolina are apparently concerned about the storage in their state of 24,000 spent nuclear fuel rods, and even about the storage of the 409 rods under consideration in this action. They fairly observe that "the environmental consequences of even a single accident [involving spent fuel rods of highly-enriched uranium] could be devastating."
 
 
 32
 While the record reveals South Carolina's sincere concern over the storage of spent nuclear fuel in the State, the limited issue before us is the procedural one of whether the Department of Energy properly prepared and relied on its Environmental Assessment with respect to the 409 rods in urgent need of shipment. Granting the proper deference to the federal agency, we affirm the Department of Energy's procedural actions under NEPA, leaving to Congress and to South Carolina any continuation of the substantive dialogue about the advisability of further storage of nuclear fuel in South Carolina.[2] See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) ("The fundamental policy questions appropriately resolved in Congress and in the state legislatures are not subject to reexamination in the federal courts under the guise of judicial review of [an agency's NEPA action]").
 
 
 33
 Accordingly, the judgment of the district court is reversed and the injunction entered by the district court on January 27, 1995, is vacated.
 
 
 34
 IT IS SO ORDERED.
 
 DONALD RUSSELL, Circuit Judge, dissenting:
 
 35
 I dissent from the majority's decision to vacate the district court's injunction.
 
 I.
 
 36
 We live in a nuclear age. We have learned how to use nuclear energy to create a bomb that was used to bring an end to World War II. See Donald Kagan, Why America Dropped the Bomb, Commentary, Sept. 1995 at 17 (responding to revisionist arguments criticizing the United States' decision to drop atomic bombs on Hiroshima and Nagasaki). Since the beginning of the Atoms-for-Peace program in 1954, the United States has also promoted the development and utilization of nuclear energy for commercial purposes.
 
 
 37
 We have made great strides in nuclear technology, but we have solved only half of the problem. In using nuclear fuel over the last forty years, we have generated large amounts of plutonium wastes. "Plutonium is generally accepted as among the most toxic substances known; inhalation of a single microscopic particle is thought to be sufficient to cause cancer." Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n, 547 F.2d 633, 638 (D.C.Cir.1976), rev'd on other grounds, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). We have developed no safe procedure for disposing of these nuclear wastes.
 
 
 38
 It has been well remarked that, despite decades of effort, we still await a solution to the disposal of spent nuclear fuel.[1] For many years, reprocessing seemed the only practical way to provide for the safe storage of spent nuclear fuel. There was an absence of any serious attempt to plan or construct a permanent repository to store spent fuel. In the early 1970's, however, environmentalists waged an attack on reprocessing facilities, charging that the plutonium in spent fuel posed an intolerable risk to the public's health and safety. The death knell to reprocessing came in 1977, when President Carter declared an indefinite ban on reprocessing of spent fuel in the United States. This ban shut down, before it ever went into operation, the reprocessing facility at Barnwell, South Carolina, that was built with private funds. Although President Reagan lifted the ban on reprocessing in 1981, the Barnwell facility has never reopened, and the government's efforts to dispose of spent nuclear fuel since 1977 have not focused on reprocessing.
 
 
 39
 Until 1977, the disposal of spent fuel in permanent storage repositories had never been considered a viable option. When President Carter banned reprocessing, however, he assured the domestic nuclear industry that the government would develop an interim storage facility for spent fuel. Although President Carter was unable to obtain congressional authorization for such a facility, Congress finally acted in 1982 by passing the Nuclear Waste Policy Act of 1982 ("NWPA"), 42 U.S.C. Sec. 10101 et seq., which provided for the expeditious development of a permanent repository for spent nuclear fuel. Congress found that the accumulation of spent nuclear fuel and other radioactive wastes had created "a national problem," and that "Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate." 42 U.S.C. Sec. 10131(a)(2) and (3). In passing the NWPA, furthermore, Congress remarked that "[t]he failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated." H.R.Rep. No. 97-491, Part 1, 97th Cong., 2d Sess. 28 (1982), reprinted in 1982 U.S.C.C.A.N. 3792, 3794.
 
 
 40
 The government has never built such a facility. Even though domestic utilities have already been compelled to pay the government billions of dollars to finance the construction of a permanent repository, the government has never been able to identify a suitable site to locate the facility. Meanwhile, spent nuclear fuel continues to pile up at each of the 109 commercial nuclear power plants in the United States. For a more thorough discussion of the government's efforts to dispose of spent nuclear fuel, see Florida Power & Light Co. v. Westinghouse Elec. Corp., 826 F.2d 239, 243-53 (4th Cir.1987), cert. denied, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 890 (1988).
 
 
 41
 Even though we have never solved the problem of the disposal of spent nuclear fuel from domestic nuclear power plants, the government now wants to compound the problem by accepting 24,000 spent fuel rods from foreign research reactors for storage in the United States. To this end, the government has been preparing an Environmental Impact Statement ("EIS"), which it claims it will complete in September 1995. Meanwhile, the government wants to accept up to 409 spent fuel rods before it completes the EIS.
 
 
 42
 Although it has clamored about the urgent need to accept these rods to preserve the non-proliferation interests of the United States, the government has downplayed the reality that there is no permanent storage facility for these, or any, spent fuel rods. Although the Savannah River Site has the capacity to store 409 rods, it, like the on-site storage facilities beside each nuclear power plant in the United States, is not a permanent solution to the disposal of spent nuclear fuel. The government, since 1982, has been working without success to obtain authorization to build a permanent storage facility for our own spent nuclear fuel. It has been unable even to select a site for such a repository. Given the government's lackluster trackrecord, there is no reason to believe that it will receive the authorization to build a storage facility for the 24,000 spent fuel rods it wants to accept from foreign research reactors. In any event, the construction of such a geologic repository would be an enormous undertaking. As the Department of Energy has explained:
 
 
 43
 A geologic repository can be viewed as a large underground mine with a complex of tunnels occupying roughly 2,000 acres at a depth between 1,000 and 4,000 feet. To handle the waste received for disposal, surface facilities will be developed which will occupy about 400 acres. The repository will be operational for about 25 to 30 years. After the repository is closed and sealed, waste isolation will be achieved by a system of multiple barriers, both natural and engineered, that will act together to contain and isolate the waste as required by regulations.
 
 
 44
 1 United States Dep't of Energy, Environmental Assessment: Yucca Mountain Site, Nevada Research and Development Area, Nevada 1 (May 1986).
 
 
 45
 Instead of finding a permanent solution to the disposal of spent nuclear fuel, the United States has concentrated its efforts on controlling the market for highly-enriched uranium. Under the Reduced Enrichment for Research and Test Reactors program (the "Reduced Enrichment program"), the United States has agreed to accept the spent fuel from foreign research reactors if they agree to convert their operations for the use of low-enriched uranium, which cannot be used to make nuclear weapons. The government claims that the United States needs to accept 409 spent fuel rods so that the foreign research reactors will remain in the Reduced Enrichment program. By accepting the spent fuel, we are inducing the foreign research reactors to use low-enriched uranium. However, it is difficult for me to believe that the United States can successfully control the market for highly-enriched uranium when such fuel is freely available from brokers in Russia, China, and other countries, and where it is cheaper and easier to operate a reactor with high-enriched uranium. See Declaration of A. Axmann 5-6 (Joint Appendix ("J.A.") 867-68); United States Dep't of Energy, Environmental Assessment of Urgent-Relief Acceptance of Foreign Research Reactor Spent Nuclear Fuel 1-5 (Apr.1994).
 
 
 46
 In pursuit of this naive goal, we are accepting spent nuclear fuel from research reactor operators who are fully capable of safely storing this spent fuel without assistance from the Department of Energy ("DOE") and without forcing us to accept their spent fuel. As the district court explained, the Draft Environmental Assessment, dated February 1994, noted that " '[a]ll of the foreign research reactor operators are fully capable of safely storing this spent fuel, including provision of additional storage if needed, without DOE assistance.' " State of South Carolina v. O'Leary, Mem.Op. 7-8 (D.S.C. Jan. 27, 1995) (J.A. at 1203-04) (emphasis omitted) (quoting Draft Environmental Assessment 4-13 (Feb.1994)). The Draft Environmental Assessment also explained that the reason for the "urgent" program to accept the 409 spent nuclear fuel rods was simply that " 'many of the reactor operators do not want to continue to store this spent fuel and will not do so.' " Id. at 8 (J.A. at 1204) (quoting Draft Environmental Assessment at 4-13). Although these statements were conveniently deleted from the final Environmental Assessment, there is no question that the foreign research reactors can safely manage the spent nuclear fuel in their own countries. In fact, during the course of this litigation, two of the foreign research reactors have demonstrated their ability to manage their spent fuel without the help of the United States. In October 1993, a Belgian research reactor known as SCK/CEN arranged to have its spent fuel reprocessed at the facility in Dourneay, Scotland. See id. at 6-7 (J.A. at 1202-03). More recently, the Hahn-Meitner Institut in Berlin arranged to have 52 spent fuel rods sent to Scotland for reprocessing.
 
 
 47
 Although the DOE found that the storage of 409 spent nuclear fuel rods at the Savannah River Site would not cause a significant environmental impact, the Defense Nuclear Facilities Safety Board ("DNFSB")[2] conducted an inspection of the Savannah River Site more recently and found problems with the management of the spent fuel currently stored there. The DNFSB found that some of the materials currently in wet storage have experienced significant corrosion, which is "contaminating the facility, generating significant waste, and contributing to personnel exposure." Memorandum of J. Kent Fortenberry to G.W. Cunningham, Technical Directory of the DNFSB ("DNFSB Memorandum") 1 (July 14, 1995). Although there is a general consensus that the spent fuel can be maintained safely in dry storage, id. at 3, the DOE plans to keep the spent fuel in wet storage for the next ten years, id. at 1. The DNFSB concluded that a more urgent response to the problems of wet storage is required. Id. Given the problems with maintaining the spent nuclear fuel currently stored at the Savannah River Site, it strains credibility for the DOE to conclude that the storage of 409 additional spent fuel rods, coming in from abroad, will not cause a significant environmental impact. It must also be remembered that the risk involved with nuclear materials cannot be measured by its quantity; even small additions to the number of spent fuel rods stored at the Savannah River Site significantly adds to the risk of a catastrophe.
 
 
 48
 The DOE has claimed that it will complete the EIS this month, which would provide a legal basis for the admission of the foreign spent fuel into this country. Considering that our domestic nuclear industry has waited over forty years for a solution to the disposal of spent nuclear fuel, the foreign research reactors can certainly wait one more month for the DOE to complete its EIS before the United States accepts their spent fuel. Despite the government's plea of "urgency," the nuclear waste disposal problem cannot be any more urgent for the foreign research reactors than it is for domestic commercial reactors.
 
 
 49
 Moreover, once we accept spent nuclear fuel from foreign concerns, we cannot give it back. Once the spent fuel rods reach the territorial boundaries of the United States, we take title to those rods. The United States has no ability to return the spent fuel rods to the foreign research reactors at a later date. When spent fuel is sent to the reprocessing facility in Dourneay, Scotland, the United Kingdom's Atomic Energy Authority requires by contract that the sender take back the reprocessed fuel. The United States has not included such a provision in its acceptance of the 409 spent nuclear fuel rods. It is foolish and irresponsible to accept any amount of spent nuclear fuel until the government demonstrates that it can build a permanent facility to store the spent fuel.
 
 II.
 
 50
 I continue to adhere to my position that the shipment of 409 spent nuclear fuel elements, or any portion of that amount, constitutes an improper segmentation from the Department of Energy's larger plan to accept 24,000 spent fuel elements from foreign research reactors over the next ten to thirteen years. See 40 C.F.R. Sec. 1508.27(b)(7) ("Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.").
 
 
 51
 The majority argues that the current action to accept 409 spent fuel elements is distinct from the proposed action to accept 24,000 elements: whereas the action to receive 24,000 spent fuel elements requires the construction of a facility to store the elements, the 409 elements in need of urgent acceptance is different because they can be stored at existing and approved facilities at the Savannah River Site. The majority also insists that the acceptance of the 409 elements in the urgent relief program will not in any way commit the government to accept the larger shipment of 24,000 spent fuel elements. I believe that the latest draft of the EIS, and the choices considered therein, demonstrates that the majority's position is untenable.
 
 
 52
 According to the March 1995 draft, the EIS studies three different alternatives for managing the spent nuclear fuel from foreign research reactors. The most ambitious management alternative, Management Alternative 1, would involve the acceptance of roughly 24,000 spent nuclear fuel elements over a ten to thirteen year period. Management Alternative 2 would involve the management of spent nuclear fuel overseas either by providing assistance, incentives, and coordination for the storage of spent fuel at one or more locations overseas, or by providing nontechnical assistance, incentives, and coordination for the reprocessing of spent nuclear fuel at overseas reprocessing facilities. Management Alternative 3, the hybrid alternative, would involve a combination of accepting spent fuel elements for storage in the United States and providing assistance for the management of spent fuel overseas. The Draft EIS also considers the alternative of taking no action.
 
 
 53
 The EIS does not propose a permanent solution to the storage of the 24,000 spent fuel elements that would be accepted under Management Alternative 1. Instead, the EIS proposes a two-phase storage plan for managing the accepted spent fuel for a 40-year period. In phase 1, spent nuclear fuel elements would be shipped to existing facilities for interim storage while the Department of Energy constructs a more permanent storage facility. The EIS explains that only two facilities could serve as potential phase 1 sites: the Savannah River Site and the Idaho National Engineering Laboratory. See Department of Energy, Draft Environmental Impact Statement on a Proposed Nuclear Weapons Nonproliferation Policy Concerning Foreign Research Reactor Spent Nuclear Fuel ("Draft EIS") Sec. S.2.7.3 (Mar.1995). Phase 2 would begin when the DOE constructs a new facility or refurbishes an existing facility for the 40-year storage of the spent fuel elements. The Draft EIS considers five possible sites for such a phase 2 storage facility: the Savannah River Site, the Idaho National Engineering Laboratory, the Hanford Site, the Oak Ridge Reservation, and the Nevada Test Site. Draft EIS Sec. S.2.7.3.1.
 
 
 54
 The EIS does not analyze the management of the accepted spent fuel elements beyond a 40-year period. The EIS contemplates the development of a geologic repository for permanent storage of spent nuclear fuel but concedes that such a program is in its early stages. In fact, the Department of Energy has not even developed the criteria for the types of waste that would be acceptable for deposit into the proposed geologic repository, and it is not clear at this time whether the 24,000 spent nuclear fuel elements accepted from foreign research reactors under Management Alternative 1 would qualify for storage in the repository. See Draft EIS Secs. S.2.2.2 and S.2.6.
 
 
 55
 The DOE insists that it will not select a management alternative until it issues the final EIS, which it claims will be completed in September 1995. In fact, the DOE has already begun implementation of Management Alternative 1. In September 1994, this Court allowed the government to accept a shipment of 153 spent nuclear fuel elements from foreign research reactors for storage at the Savannah River Site. In lifting the district court's injunction in this case, this Court authorizes the government to accept a second shipment of 157 rods to be stored at Savannah River. Although the DOE insists that these "urgent" shipments are part of a separate program, the fact remains that under Management Alternative 1, the government proposes to import the same type of spent fuel elements from the same set of research reactors and to store them at the same facility. The only difference between these "urgent" shipments and the shipments under Management Alternative 1 is the timing. By segmenting the "urgent" shipments from its larger plan to accept 24,000 rods, the DOE has begun implementing Management Alternative 1 before it has completed the EIS.
 
 
 56
 The majority insists that these shipments of spent fuel elements are not improper segments of the DOE's proposed action to accept 24,000 fuel rods. The majority argues that the "segmentation of one phase of a larger project prior to the completion of the environmental review of the entire project constitutes impermissible segmentation only if the component action has a 'direct and substantial probability of influencing [the agency's] decision' on the larger project." See supra at 898-99 (citing State of North Carolina v. City of Virginia Beach, 951 F.2d 596, 603 (4th Cir.1991)). The majority concludes that the urgent relief shipments do not constitute such an impermissible segmentation because it finds that the acceptance of the urgent relief shipments will not influence the government's decision on its larger program to import 24,000 rods.
 
 
 57
 The standard cited by the majority is the result of two Fourth Circuit cases on segmentation. In Maryland Conservation Council, Inc. v. Gilchrist, 808 F.2d 1039 (4th Cir.1986), Montgomery County, Maryland, planned to build a highway across Seneca Creek State Park. Although the highway project crossed a state park, the Court found that it was a federal action that required the approval of the Secretary of the Interior, and possibly the Secretary of the Army and the Secretary of Transportation,[3] none of whom could authorize the project without first considering an environmental impact statement. Id. at 1042. Before such a statement was completed, however, the County began construction of the segments of the highway on both sides of the park. Various citizens' groups sought an injunction from any portion of the highway until the environmental review was completed.[4] This Court agreed, stating:
 
 
 58
 Because it is inevitable that the construction of the highway will involve a major federal action, it follows that compliance with NEPA is required before any portion of the road is built. This conclusion effectuates the purpose of NEPA. The decision of the Secretary of the Interior to approve the project, and the decision of any other Secretary whose authority may extend to the project, would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS. The completed segments would "stand like gun barrels pointing into the heartland of the park." ... It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent. Non-federal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a fait accompli.
 
 
 59
 Id.
 
 
 60
 This Court reached the opposite conclusion in State of North Carolina v. City of Virginia Beach, 951 F.2d 596 (4th Cir.1991). In Virginia Beach, the City of Virginia Beach sought to construct an 85-mile pipeline from Lake Gaston, on the Virginia-North Carolina border, to Virginia Beach. The Army Corp of Engineers, after conducting an environmental assessment and issuing a finding of no significant impact, granted the City a permit to construct the pipeline. However, because the proposed pipeline crossed land surrounding a hydropower generation facility that was licensed by the Federal Energy Regulatory Commission (the "FERC"), the FERC had to grant its approval to the project. While seeking the FERC's approval, the City sought to begin construction on certain portions of the pipeline outside of the FERC's jurisdiction. Although these portions represented only $8.4 million of a $218.9 million project, beginning work prior to the FERC's approval would save 12 to 15 months in overall project time if the FERC ultimately gave its approval.
 
 
 61
 The district court, relying on Gilchrist, enjoined all pipeline construction until the FERC granted its approval, and it refused to make an exception for the relatively minor amounts of work contemplated by the City. This Court reversed, holding that "construction which lies beyond the boundaries of FERC's jurisdiction can be enjoined only when it has a direct and substantial probability of influencing FERC's decision." Id. at 603 (emphasis added). It concluded that the minor phases of construction sought by the City would not have such a direct and substantial impact on the FERC decision-making.
 
 
 62
 The case currently before this Court differs from Gilchrist and Virginia Beach. Gilchrist and Virginia Beach each involved a non-federal actor who was actively pushing for a project that required the approval of a relatively neutral federal agency. When the non-federal actor sought to begin construction of the project before receiving the federal approval, the Court examined to see whether such construction would have a direct and substantial probability of influencing the federal agency's ability to make an objective decision on the project.
 
 
 63
 In the case before this Court, a federal agency, the DOE, is actively promoting a plan to accept 24,000 spent nuclear fuel rods into the United States. Before it can proceed, however, the National Environmental Protection Act ("NEPA") requires the DOE to complete an EIS, forcing the agency to consider the environmental consequences of and alternatives to its proposed action. Although NEPA cannot ultimately stop the DOE from proceeding with its proposed action, it does at least prevent the federal agency from taking an action while completely blind to its environmental consequences. It undermines the purposes of NEPA, and is a bit unseemly, for the DOE to begin implementation of its proposed action while it claims to be studying the environmental impacts and considering other alternatives. The EIS should be more than a formality. Before the DOE begins importing large amounts of spent nuclear fuel, which rank among the most dangerous material that humanity has ever tried to control, we should require the DOE to complete its environmental review.
 
 III.
 
 64
 I continue to object to the piecemeal approach by which the government has taken with respect to the disposal of spent nuclear fuel from foreign research reactors. Unable to complete the EIS required to accept the 24,000 spent fuel rods, it has begun implementation of its program by claiming an urgent need to accept smaller shipments of 153 rods and 157 rods. I refuse to endorse the government's scheme. This Court should not allow the government to accept any shipments of spent nuclear fuel rods until it completes the EIS, as required by NEPA.
 
 
 65
 I dissent.
 
 
 
 [1]
 The Spence Amendment provides in pertinent part:
 Sec. 3151. Limitations on the Receipt and Storage of Spent Nuclear Fuel from Foreign Research Reactors.
 (a) PURPOSE.--It is the purpose of this section to regulate the receipt and storage of spent nuclear fuel at the Department of Energy defense nuclear facility located at the Savannah River Site, South Carolina (in this section referred to as the "Savannah River Site").
 (b) RECEIPT IN EMERGENCY CIRCUMSTANCES.--When the Secretary of Energy determines that emergency circumstances make it necessary to receive spent nuclear fuel, the Secretary shall submit a notification of that determination to the Congress. The Secretary may not receive spent nuclear fuel at the Savannah River Site until the expiration of the 30-day period beginning on the date on which the Congress receives the notification.
 (c) LIMITATION ON STORAGE IN NON-EMERGENCY CIRCUMSTANCES.--The Secretary of Energy may not, under other than emergency circumstances, receive and store at the Savannah River Site any spent nuclear fuel in excess of the amount that (as of the date of the enactment of this Act) the Savannah River Site is capable of receiving and storing, until, with respect to the receipt and storage of any such spent nuclear fuel--
 (1) the completion of an environmental impact statement under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)....
 Pub.L. No. 103-160, Sec. 3151, 107 Stat. 1547, 1949 (enacted November 13, 1993).
 
 
 [2]
 The enactment of the Spence Amendment is a manifestation of this dialogue, reaffirming that Congress is the appropriate forum for airing these substantive policy issues. Moreover, its enactment evidences that South Carolina enjoys sufficient power as a participant in this dialogue to assure that its position is given fair consideration
 
 
 [1]
 As the D.C. Circuit has stated:
 The word disposal may itself be misleading, for it connotes some physical or chemical step which renders the wastes less toxic. Under present technology, the only known agent of detoxification is the passage of great amounts of time. The phase of the nuclear fuel cycle referred to as "disposal" generally refers only to storage of wastes in physical isolation.
 Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n, 547 F.2d 633, 637 n. 3 (D.C.Cir.1976), rev'd on other grounds, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). In the two decades since this opinion, we have not developed a technology to detoxify nuclear wastes.
 
 
 [2]
 The DNFSB is an independent oversight agency created in 1988 to ensure that the DOE's nuclear facilities do not have adverse effects on public health and safety. See 42 U.S.C. Sec. 2286
 
 
 [3]
 Because the state park was established with a grant of substantial federal funds, the approval of the Secretary of the Interior was required before park land could be converted to other than public outdoor recreation uses. Id. at 1042 (citing Land and Water Conservation Fund Act Sec. 6(f), 16 U.S.C. Sec. 460l -8(f)(3)). If the highway impinged on wetlands in the park, a permit from the Secretary of the Army would be required to dredge wetlands. Id. (citing Federal Water Pollution Control Act Sec. 404, 33 U.S.C. Sec. 1344). Furthermore, to the extent that the County sought federal-aid highway funds, the approval of the Secretary of Transportation would also be required. Id. (citing Department of Transportation Act Sec. 4(f), 49 U.S.C. Sec. 303(c))
 
 
 [4]
 Although these groups conceded that some highway access through the park was essential, they preferred a route that created the least damage to the park. The County began constructing the highway on a route that would have taken three times as much park land as other alternative routes. Gilchrist, 808 F.2d at 1041